Alan G. Crone, TN Bar No. 014285
Philip Oliphant, TN Bar No. 025990
THE CRONE LAW FIRM, PLC
88 Union Avenue, 14th Floor
Memphis, TN 38103
901.737.7740 (voice)

Mike Lingle
THOMAS & SOLOMON, LLP
693 East Avenue
Rochester, NY 14607
585.272.0540 (voice)

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

**Kenneth Cooley, Jeremy Lemaster,**
**Robert Needham, and**
**Jamie Collins**, *on behalf of*
*themselves and all others similarly situated,*

       **Plaintiffs,**

                     Civil Action, Case No.: 2:19-cv-00850

v.

**Air Methods Corporation,**
*a Delaware Corporation,*

       **Defendant.**

---

**UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT WITH INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES**

---

### MOTION

    Plaintiffs, by and through counsel, respectfully move the Court for Final Approval of Settlement. The Parties have agreed to a resolution of this lawsuit that is reasonable and fair to the Collective. The Parties have reached an arm's length settlement at the conclusion

of a vigorous discovery period and while three dispositive motions were pending before the Court. Defendant has agreed to resolve Plaintiffs' claims in exchange for payments totaling $5,800,000.00.

On the basis of the discussion and analysis that follows, Plaintiffs respectfully request that this Court grant final approval of the settlement, allowing distribution of settlement funds to commence at the earliest practicable date. This Motion is based on and supported by the Court's entire record of this matter, the memorandum of points and authorities provided below; and the exhibits attached hereto.

### MEMORANDUM OF POINTS AND AUTHORITIES

**1. PROCEDURAL BACKGROUND**

This civil action was initiated on February 8, 2019, upon the filing of a Complaint (Doc. 1.) by Plaintiffs Kenneth Cooley, Jeremy Lemaster, Robert Needham, and Jamie Collins, and amended on September 6, 2019. (Doc. 82.) This is a collective action alleging overtime violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. brought by paramedics and flight nurses employed by Air Methods Corporation ("AMC"), a provider of air ambulance services.

On August 20, 2020, Plaintiffs filed their Motion for Conditional Certification as a Collective Action. (Doc. 215.) Plaintiffs' motion was granted on September 25, 2020. (Doc. 230.) In February 2021, the opt-in process was completed, resulting in a collective of over 1,050 members.

While litigation in the present matter continued, three separate wage and hour lawsuits against AMC reached settlement. Those matters were *Helmick v. AMC*, Superior Court of California, No. RG13665373; *Day v. AMC*, U.S. District Court for the Eastern District of Kentucky, No. 5:17-CV-183-CHB; and *Wagner v. AMC*, U.S. District Court of Colorado, No. 1:19-cv-00484. Certain participants in those settlements were foreclosed under the law, in part or whole, from participation in the settlement of the present matter. As a result, and after eliminating all other collective applicants who were ineligible for other reasons, the final collective had 943 members.

The Parties engaged in extensive and time-consuming discovery over a two-year period, including a 30(b)(6) deposition on November 12, 2019 and culminating in the completion of the deposition of all four Named Plaintiffs on April 28, 2021. The discovery period formally ended on May 21, 2021. (Doc. 323.)

On July 30, 2020, the Parties and their respective counsel engaged in mediation before a private mediator in Phoenix, Arizona. The Parties were unable to reach a settlement, however, despite the Parties' good faith efforts.

Following the unsuccessful mediation, the Parties' respective counsel continued to negotiate. Their arm's length negotiations have resulted in the present proposed agreement settling Plaintiffs' FLSA Collective Action claims in their entirety. (*See* Collective Action Settlement Agreement and Release, Exhibit A.) On January 12, 2022, the Parties filed a Notice of Settlement. (Doc. 363.) In response, the Court ordered the

Parties to submit a joint motion for preliminary settlement approval. (Doc. 364.) On February 22, the Parties filed their joint motion for preliminary settlement approval (Doc. 369) and on March 7 the Court granted the motion, requiring that Defendant provide the settlement administrator with a list of collective members and requiring that the administrator send notice of settlement to all collective members. (Doc. 370.) The Court further ordered that Plaintiffs' counsel file with the Court a motion for final approval of the settlement within sixty days of the original mailing of the notice of settlement and set the Final Approval hearing for June 16, 2022 at 10:00 a.m. (Id.)

In compliance with the Court's order, on March 21 Defendant provided the designated Settlement Administrator with the class list of 943 class members and on April 11 notices were mailed via First Class Mail to all members on the list. At the end of the notice period, the Settlement Administrator reported that two class notices were returned undeliverable, six requests for exclusion from the settlement had been received and four objections had been submitted. (*See* Settlement Administrator Report, Exhibit B; Collective List, Exhibit C.) Having thus complied with the Court's order, the Parties hereby move for final approval of the settlement.

**2. THE PARTIES SETTLEMENT AGREEMENT AND RELEASE**

The details of the Parties' settlement are contained in the Settlement Agreement and Release. (Exhibit A.) The following summarizes the key terms.

    **a. The Settlement Amount and Distribution Formula**

To settle Plaintiffs' claims, Defendant has agreed to pay a Gross Settlement

Amount of five million, eight-hundred thousand dollars ($5,800,000.00). This includes settlement awards to Collective Members, service awards to Named Plaintiffs, attorneys' fees and costs, and settlement administration costs.

### i. The Total Claims Amount Paid to the Collective

The Parties have agreed to allocate individual settlement payments to each Collective Member using a *pro rata* share of the $4,263,054.79 Net Settlement Fund[1], based upon the Parties' stipulated calculation of alleged damages. Specifically, each Collective Member's settlement share was first calculated by determining the amount of sleep time overtime pay Plaintiffs have alleged they should have been paid but not were paid, at the overtime rate of one and a half times their regular rate of pay, during their employment with AMC, from February 8, 2016 to present. The total alleged under-compensation for each Member was then divided by the total alleged under-compensation for the entire Collective to arrive at each Member's percentage of the entire settlement fund, after the expenses and fees described above were deducted.

The resulting distribution of funds is set forth in the attachment to Exhibit C. As indicated therein, each member of the collective is to receive approximately 31% of the amount claimed.

### ii. Plaintiff Service Payments

---

[1] The Gross Settlement, less Collective Counsel Fees, Settlement Administrator Costs, and Representative Enhancement Payments.

The Parties have agreed to set aside $10,000 from the Gross Settlement Amount for each of the four named plaintiffs. These amounts are in addition to these Plaintiffs' *pro rata* allocations. These payments provide the named plaintiffs with compensation for their service on behalf of the collective.

### iii.  Attorneys' Fees and Litigation Costs

The Parties have agreed to allocate twenty-five percent (25%) of the Gross Settlement Amount to Plaintiffs' attorneys' fees. This amount equals $1,450,000 and represents a percentage considerably less than that Plaintiffs agreed to in their legal services agreement with Counsel. Additionally, $16,443 of the Gross Settlement Amount will be allocated as reimbursement for Plaintiffs' litigation costs and expenses.

### iv.  Settlement Administration

The Parties have engaged the settlement administration services of Simpluris, Inc. The cost of Simpluris's services is $16,133.07. Settlement administration fees will be paid from the Gross Settlement Amount.

### b. Release of Claims

The Settlement Collective Members, including Named Plaintiffs, agree to release Defendant and all of its past or present subsidiaries, related companies, parents, successors, assigns, current and former managers, employees, owners, officers, directors and agents from any and all claims arising out of or relating to the manner in which they were compensated by Defendant.

### 3. LEGAL ANALYSIS

6

This Court has jurisdiction over Plaintiffs' FLSA collective action claims. 29 U.S.C. §216(b). In order to effectuate a binding release on a collective basis, FLSA settlements require either judicial or U.S. Department of Labor approval. *Seminiano v. Xyris Enter., Inc.*, 602 Fed. Appx. 682, 683 (9th Cir. 2015) (citing, with approval, *Nall v. Mal–Motels, Inc.*, 723 F.3d 1304, 1306 (11th Cir. 2013)); *Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350, 1352-54 (11th Cir. 1982)). Under *Lynn's*, "settlement of FLSA claims may be allowed by a stipulated judgment entered by a court which has determined that a settlement proposed by an employer and employees, in a suit brought by the employees under the FLSA, is a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Gamble v. Boyd Gaming*, 2017 WL 721244, at *4 (D. Nev. Feb. 23, 2017) (quoting *Lynn's*, 679 F.2d at 1355) (internal quotations omitted). For the reasons explained below, the record plainly demonstrates that the Parties' settlement constitutes a reasonable resolution of a bona fide dispute.

**a. There was a bona fide dispute**

Courts typically rely on the adversarial nature of a litigated FLSA case resulting in settlement as an indication of fairness. *See Lynn's*, 679 F.2d at 1354. A settlement agreement signals a bona fide dispute when it "reflect[s] a reasonable compromise over issues . . . that are actually in dispute." *Nen Thio v. Genji, LLC*, 114 F. Supp. 3d 1324, 1333 (N.D. Cal. 2014). The present matter presents numerous hotly disputed legal issues. Firstly, AMC has asserted from the beginning of this litigation that it is exempt from the overtime provisions of the FLSA because it is, and was at all relevant times, a

"carrier by air" subject instead to the Railway Labor Act (RLA). (Doc. 137-1, p. 5.) Plaintiffs, on the other hand, argued that even if this is technically true, Defendant is precluded from asserting this exemption defense because it repeatedly and unequivocally represented that Plaintiffs' positions were non-exempt, and Plaintiffs relied on these assertions to their detriment. (Doc. 146, p. 4.) Plaintiff's argument is based on the legal doctrine of equitable estoppel. In the Court's May 4, 2020 Order on Defendant's Motion for Partial Summary Judgment, the Court held that "although AMC's employees are in fact FLSA exempt, AMC cannot prevail at summary judgment because Plaintiffs have made a prima facie case of equitable estoppel which, if successful, could preclude AMC availing itself of the FLSA's exemptions." (Doc. 153, p. 6.) Thus, the Court left unresolved whether AMC could be held liable for overtime violations of the FLSA, requiring further litigation of this core dispute.

In their own Motion for Partial Summary Judgment, Plaintiffs asked the Court to resolve this issue, arguing that existing evidence showed that all requirements of the equitable estoppel test were met and thus AMC should be precluded from asserting an FLSA exemption as a common carrier subject to the RLA. (Doc. 326-1, pp. 9-15.) Defendant vigorously contested Plaintiffs' equitable estoppel argument, asserting that the evidence of AMC's representations to the opt-in plaintiffs was inconclusive. (Doc. 357, p. 10.)

Building upon their equitable estoppel argument, Plaintiffs further argued that summary judgment should be granted as to their claim of FLSA overtime violations on

grounds that AMC's Agreement for 24-Hour Shifts of Duty, upon which it based its practice of exempting sleep time from overtime pay, was contrary to the requirements of the FLSA and thus legally null and void. Plaintiffs also asserted that Defendant's FLSA violations were made in bad faith and thus Plaintiffs were entitled to liquidated damages as well as actual damages. (Doc. 326-1, p. 20.) Defendant countered that its 24-hour shift agreement actually provided contractually agreed upon compensation above that required under the FLSA's Sleep-Time Regulation and any failure by the company to comply with the FLSA was inadvertent and made in good faith. (Doc. 357, pp. 14-21.)

Shortly after Plaintiffs filed their Motion for Summary Judgment, Defendant filed a Motion for Decertification and a second Motion for Summary Judgment. In the decertification motion, Defendant argued that the matter was too fact intensive and the opt-in plaintiffs were too diverse in their work circumstances to make litigation of the matter as a collective action practicable. (Doc. 327-1.) On this ground, Defendant asked that the collective be decertified, effectively dismissing the opt-in plaintiffs from the case. Plaintiffs countered that while factual differences inevitably existed between the plaintiffs, Plaintiffs' equitable estoppel claims and FLSA claims were common across the entire collective and, therefore, collective certification should be upheld. (Doc. 359.)

In Defendant's second Motion for Summary Judgment, largely re-arguing their response to Plaintiff's Motion for Partial Summary Judgment, Defendant asked for summary judgment on the ground that the evidence showed that it had not violated the FLSA overtime requirements. (Doc. 335-1.) In response, Plaintiffs argued that

Defendant's second summary judgment motion was prohibited under the Court's Scheduling Order, that AMC's 24-Hour Shift Agreement violated the FLSA sleep-time regulations, and that disputes of material fact existed as to the adequacy of sleep facilities provided to clinicians and as to sleep interruptions suffered by clinicians. (Doc. 357.)

The above lengthy summary should make it altogether clear that this case involved not one but many novel, complex, and hotly disputed legal issues, with strong arguments on both sides.

### a. THE SETTLEMENT IS FAIR AND REASONABLE

The Settlement Agreement and Release resolves a *bona fide* dispute between the Parties that has been arduously litigated for almost three years. As discussed above, the Parties reached this settlement at the conclusion of extensive discovery and dispositive motion practice. The Parties came to the agreement through continuing arm's length negotiations, including mediation with a third-party neutral. The settlement has been approved by all four representative plaintiffs, whose authority to negotiate resolution of the matter was consented to by each opt-in plaintiff.

In reaching this settlement, the Parties took into account all known facts and circumstances, including the risk of significant delay, as well as the expense and risks associated with both sides' pending dispositive motions. Moreover, the likely duration, complexity, and expense of future litigation would be a heavy burden on both Parties.

Under these circumstances, a presumption of fairness should attach to the

settlement. *See Gamble*, 2016 WL 3693743, at *5 (D. Nev. July 11, 2016) (reasoning that an arms-length settlement after lengthy negotiations is "highly indicative of fairness") (quoting *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1171 (S.D. Cal. 2007)).

To determine whether settlement terms are fair and equitable to all parties, courts consider a multitude of factors, including: (1) the stage of the litigation and the amount of discovery exchanged, (2) the experience of counsel, (3) the probability of the plaintiffs' success on the merits, (4) any overreaching by the employer in the settlement negotiations, and (5) whether the settlement is the product of arm's length negotiations between represented parties based on the merits of the case. *See Fontes v. Drywood Plus, Inc.*, 2013 WL 6228652, at *6 (D. Ariz. Dec. 2, 2013); *Selk v. Pioneers Meml. Healthcare Dist.*, 159 F. Supp. 3d 1164, 1173 (S.D. Cal. 2016) (collecting cases).

### i. The Stage of the Litigation and the Amount of Discovery Exchanged

As noted above, the Parties engaged in extensive and time-consuming discovery over a two-year period, including a 30(b)(6) deposition on November 12, 2019, and culminating in the completion of the deposition of all four Named Plaintiffs on April 28, 2021. The discovery period formally ended on May 21, 2021, after which the Parties argued and defended three separate dispositive motions. Thus, the Parties possessed sufficient information to reach an informed, fair, and reasonable settlement.

### ii. The Experience of Counsel

Plaintiffs were represented by seasoned and capable counsel who have significant experience litigating FLSA cases including collective actions. Mr. Crone, Mr. Oliphant and Mr. Lingle have considerable depth and breadth of experience representing plaintiffs in FLSA cases, including multi-million-dollar settlements, that was essential in reaching the present proposed settlement, as set forth in the declaration attached in support of Plaintiffs' Motion (Declaration of Philip Oliphant, Exhibit D.).

### iii. The Probability of Plaintiffs' Success on the Merits

The Parties faced considerable risks with proving their claims and defenses. The parties hotly contested whether the opt-ins were similarly-situated, whether Defendant's 24-hour shift agreement violated the FLSA, and whether Defendant was equitably estopped from claiming exemption under the Railway Labor Act. Both sides presented powerful, skillfully-crafted arguments for their position. An adverse ruling on any of three pending motions could have dramatically reduced the value of Plaintiffs' claims or decimated them entirely. Given the significant expense and uncertainty associated with prosecuting these claims through trial, this settlement provides fair and adequate relief to the Plaintiffs.

### iv. Any Overreaching by the Employer in the Settlement Negotiations

Given Plaintiffs' counsel's extensive experience, it is unlikely that AMC could have overreached in the settlement negotiations in any way. Further, the release agreed to is appropriately limited to wage and hour claims that were or could have been brought in the litigation and the Opt-ins have been afforded the opportunity to opt-out of the

settlement if they wish to pursue a separate action on their own. Accordingly, AMC has not overreached with respect to the terms of the settlement.

### v. Whether the Settlement is the Product of Arm's Length Negotiations between Represented Parties Base on the Merits of the Case

Prior to negotiations, AMC produced voluminous time and pay records, allowing the Plaintiffs' counsel to evaluate the claims and calculate potential damages. It was on the basis of this extensive discovery that the Parties reached a mutually-agreeable settlement. Both sides were well-represented by experienced counsel. Thus, the settlement is clearly the product of informed arms-length negotiations.

## 4. NAMED PLAINTIFFS' INCENTIVE AWARD IS REASONABLE

The Parties agree to set aside $10,000 from the Gross Settlement Amount for each of the four Named Plaintiffs. These amounts are in addition to these Plaintiffs' *pro rata* allocations. These payments provide Named-Plaintiffs with compensation for their service on behalf of the collective, which included sitting for lengthy depositions, producing documents, and regularly and routinely interacting with Counsel on behalf of themselves and the collective.

The service payments to the Named Plaintiffs contemplated by the Settlement Agreement and Release provide a modest payment for the additional time and energy expended by the recipients. The Named Plaintiffs were instrumental in this action. The Collective Members are receiving this settlement offer because the four Named Plaintiffs decide to pursue this case. They devoted considerable time assisting with discovery and sitting for depositions. The Collective has benefited from the actions of these individuals.

The Court should find the service payments provide fair and reasonable compensation for the Named Plaintiffs' time and efforts.

"[T]he Ninth Circuit has recognized that service awards to named plaintiff in a class action are permissible and do not render a settlement unfair or unreasonable." *Thio,* 14 F. Supp. 3d at 1335 (citing *Staton v. Boeing Co.,* 327 F.3d 938, 977 (9th Cir. 2003)). "Incentive awards are routinely awarded to named plaintiffs for the services they provided and the risks they undertook during the litigation." *Sherman v. Corizon Health, Inc.*, 2014 WL 5690024, at *3 (M.D. Fla. Nov. 4, 2014).

### 5. PLAINTIFFS' COUNSELS' FEE AND EXPENSE RECOVERY IS REASONABLE

The Settlement Agreement provides that Plaintiffs' counsel will recover their fees from the Settlement Amount. (Exhibit A.) The FLSA requires the Court to allow a reasonable attorney's fee to be paid by the defendant. 29 U.S.C. § 216(b). As various courts have observed, the theory behind attorneys' fee awards in representative actions is that "a financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid." *Mashburn v. Natl. Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988) (cited, with approval, in *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)). The Supreme Court has "recognized consistently that . . . a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *accord Rodriguez v.*

14

*Disner*, 688 F.3d 645, 653 (9th Cir. 2012).

The Parties in the instant case have agreed to allocate twenty-five percent (25%) of the Gross Settlement Amount to Plaintiffs' attorney fees. Twenty-five percent is the "benchmark" for class actions in the Ninth Circuit, and it is often applied to collective actions as well. *See Paul, Johnson, Alston & Hunt*, 886 F.2d at 273 (9th Cir. 1989). This amount equals $1,450,000 and represents a percentage considerably less than the thirty-three percent (33%) Plaintiffs agreed to in their legal services agreement with Counsel. Additionally, approximately $16,443 of the Gross Settlement Amount will be allocated as reimbursement for Plaintiffs' litigation costs and expenses.

Within the Ninth Circuit, courts have recognized that most percentage fee awards are 33 percent or above the benchmark of 25%. *Bautista v. Harvest Mgt. Sub LLC*, 2014 WL 12579822, at *11 (C.D. Cal. July 14, 2014). Indeed, in "most common fund cases, the award exceeds that benchmark." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 491 (E.D. Cal. 2010) (internal quotation marks omitted).

Plaintiffs in this matter were represented by seasoned and capable counsel who have significant experience litigating FLSA cases including collective actions. Mr. Crone, Mr. Oliphant and Mr. Lingle have considerable depth and breadth of experience representing plaintiffs in FLSA cases, including multi-million-dollar settlements, that was essential in reaching the present proposed settlement, as set forth in the declaration attached in support of Plaintiffs' Motion (Exhibit D.)

Plaintiffs' counsel has to date spent well over 1,000 hours pursuing this collective action. Plaintiffs' counsel's labor has included, but is not limited to, filing pleadings, organizing the collective, completing discovery, including five depositions, travel between Memphis and Denver for the 30(b)(6) deposition, travel between Memphis and Phoenix for the initial hearing, complex damages calculations, and settlement negotiations.

This is a lawsuit involving the application of the FLSA's sleep time provision to Defendant's 24-Hour Shift Agreement with its flight crew employees. Defendant's exemption defense under the Railway Labor Act and Plaintiffs' claim of equitable estoppel as to that defense added considerable nuance to the legal dispute. Finally, the collective nature of this suit added a layer of complexity beyond that of an individual FLSA claim.

The unique facts and novel legal questions involved in this case required that Plaintiffs obtain the services of experienced and competent counsel. Plaintiffs' counsel competently addressed the complex issues of the case and were successful in obtaining a positive result for Plaintiffs and the proposed allocation of attorney's fees is fair and equitable under these circumstances.

**CONCLUSION**

The Parties' settlement provides a fair, reasonable, and adequate resolution to a good faith dispute over unpaid wages, approved by all four representative plaintiffs, whose authority to negotiate resolution of the matter was consented to by each opt-in plaintiff.

Accordingly, Plaintiffs respectfully request the Court approve the final Settlement Agreement and enter judgment dismissing Plaintiffs' claims with prejudice.

Respectfully Submitted,

s/ Philip Oliphant
Alan G. Crone, TN Bar No. 014285
Philip Oliphant, TN Bar No. 025990
THE CRONE LAW FIRM, PLC
88 Union Avenue, 14th Floor
Memphis, TN 38103
901.737.7740 (voice)
901.474.7926 (fax)
acrone@cronelawfirmplc.com
poliphant@cronelawfirmplc.com

and

Mike Lingle
THOMAS & SOLOMON, LLP
693 East Avenue
Rochester, NY 14607
585.272.0540 (voice)
585.272.0574 (fax)
mlingle@theemploymentattorneys.com

*Admitted Pro Hac Vice*
*Attorneys for Plaintiffs*

**CERTIFICATE OF CONSULTATION**

I, the undersigned, have consulted with Defendant's counsel, Lonnie Giamela, and he has indicated he does not oppose this motion.

s/ Philip Oliphant